No. 23-10272

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

## GRETCHEN BUSELLI,
*Defendant-Appellant.*

———————————————

A Direct Appeal of a Criminal Case
From the United States District Court
for the Northern District of Florida, Tallahassee Division

———————————————

## <u>INITIAL BRIEF OF APPELLANT</u>

**JOSEPH F. DEBELDER**
Federal Public Defender

**RICHARD M. SUMMA**
Assistant Federal Public Defender
Florida Bar No. 890588
227 N. Bronough Street, Ste. 4200
Tallahassee, Florida 32301
Telephone: (850) 942-8818
FAX: (850) 942-8809
Attorney for Appellant

No. 23-10272

United States v. Gretchen Buselli

# CERTIFICATE OF INTERESTED PERSONS

As required by Federal Rule of Procedure 26.1 and 11th Cir. Rule 26.1-2, the

following persons have an interest in the outcome of this case:

Buselli, Gretchen: Defendant/Appellant

Coody, Jason: U.S. Attorney

Davies, Robert G.: Assistant U.S. Attorney

DeBelder, Joseph F.: Federal Public Defender

Fields, Lazaro: Assistant U.S. Attorney

Fitzpatrick, Martin: Magistrate Judge

McCommon, April: U.S. Probation Officer

Mountin, Eric: Assistant U.S. Attorney

Summa, Richard M.: Assistant Federal Public Defender

Weiss, Kaitlin: Assistant U.S. Attorney

Walker, Mark: U.S. District Court Judge

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument due to the complexity of the legal issues.

# TABLE OF CONTENTS

Contents                                                                 Page

STATEMENT REGARDING ORAL ARGUMENT ................................................i

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES............................................................................2

STATEMENT OF THE CASE...............................................................................3

    (i)    Nature of the Case and Statement of Incarceration...................................3

    (ii)   Course of Proceedings and Dispositions in the Court Below ...................3

    (iii)  Statement of the Facts..............................................................................4

    (iv)  Standards of Review.................................................................................36

SUMMARY OF THE ARGUMENT .....................................................................37

ARGUMENT .......................................................................................................39

## ISSUE I

On Count I (murder-for-hire), the trial court erred, reversibly, by denying Buselli's requested jury instructions indispensable to the determination of criminal wrongdoing.........................................................................39

## ISSUE II

The offense of knowingly and willfully making a false statement to a federal agency is plainly unconstitutional as applied here; the false statements were nothing more than the denial of guilt during police interrogation; applying the statute in this context infringed on Buselli's Sixth Amendment right to plead not guilty and demand trial by jury.........................................................................51

**ISSUE III**

On Count II (knowingly and willfully making a false statement to a federal agency), the trial court erred, plainly, by relieving the jury of the duty to find Buselli acted willfully, i.e., with the intent to violate the law.........................54


CONCLUSION.........................................................................................58

CERTIFICATE OF COMPLIANCE.......................................................59

CERTIFICATE OF SERVICE ...............................................................60

# TABLE OF CITATIONS

**Cases**                                                                    **Page**

*Armstrong v. State*, 579 So. 2d 734 (Fla. 1991)...............................................41

*Arthur v. State*, 717 So. 2d 193 (Fla. 5th DCA 1998) ...................................46

*Black v. State*, 695 So. 2d 459 (Fla. 1st DCA 1997) .....................................48

*Blandon v. State*, 657 So. 2d 1198 (Fla. 5th DCA 1995) ......................5, 47

*Bryan v. United States*, 524 U.S. 184 (1998)...............................................54

*\*Carranza v. State*, 511 So. 2d 410 (Fla. 4th DCA 1987) ..........................51

*Carter v. United States*, 530 U.S. 255 (2000).............................................43

*David v. State*, 306 So. 3d 228 (Fla. 3d DCA 2020) ...................................51

*Dawson v. State*, 597 So. 2d 924 (Fla. 1st DCA 1992) ...............................51

*Delaford v. State*, 449 So. 2d 983 (Fla. 2d DCA 1984)..............................48

*\*\*\*Dixon v. United States*, 548 U.S. 1 (2006)............................................55

*Elonis v. United States*, 575 U.S. 723 (2015) .............................................43

*Garrett v. State*, 148 So. 3d 466 (Fla. 1st DCA 2014) ................................50

*Gregory v. State*, 937 So. 2d 180 (Fla. 4th DCA 2006) ..............................50

*\*Hedges v. State*, 172 So. 2d 824 (Fla. 1965) ....................................... 40, 41

*Hernandez v. State*, 842 So. 2d 1049 (Fla. 4th DCA 2003) ......................46

*\*Hill v. State*, 688 So. 2d 901 (Fla. 1996) ......................................... 4, 5, 41

*\*Howard v. Moore*, 730 So. 2d 800 (Fla. 4th DCA 1999)................... 39, 40

*Hunter v. State*, 687 So. 2d 277 (Fla. 5th DCA 1997)................................................50

*Molina-Martinez v. United States*, 578 U.S. 189 (2016)........................................57

*Philippe v. State*, 795 So. 2d 173 (Fla. 3d DCA 2001)...........................................47

*Rojas v. State*, 552 So. 2d 914 (Fla. 1989)..............................................................48

*Rosales-Mireles, v. United States*, 138 S. Ct. 1897 (2018) ....................................57

\*Ruan v. United States*, 142 S. Ct. 2370 (2022)...................................................5, 43

\*Sanders v. State*, 944 So. 2d 203 (Fla. 2006) ........................................................41

\*Smith v. State*, 773 So. 2d 1278 (Fla. 5th DCA 2000) ..........................................48

\*Spencer v. State*, 216 So. 3d 481 (Fla. 2017) ..................................................44, 47

\*State v. Lucas*, 645 So. 2d 425 (Fla. 1994)...............................................44, 47, 48

\*\*United States v. Endo*, 635 F.2d 321 (4th Cir. 1980) ..........................................53

*United States v. Fleury*, 20 F.4th 1353 (11th Cir. 2021) ........................................36

*United States v. Hughes*, 840 F.3d 1368 (11th Cir. 2016)......................................36

*United States v. Mayweather*, 991 F.3d 1163 (11th Cir. 2021).............................36

**Statutes**

18 U.S.C. § 1001(a) ............................................................................................ 37, 52

18 U.S.C. § 1001(a)(2).............................................................................................3

18 U.S.C. § 1958(a) ....................................................................................... passim

18 U.S.C. § 3231 .....................................................................................................1

v

28 U.S.C. § 1291 ..................................................................................1

Fla. Stat. § 776.012 ..............................................................................4

*Fla. Stat. § 776.012(2) .......................................................... 40, 45, 49

Fla. Stat. § 776.08 ..............................................................................49

Fla. Stat. § 782.04(1)(a) .....................................................................39

Fla. Stat. § 782.07(1) ..........................................................................39

## Rules

11th Cir. Rule 26.1-2..............................................................................2

Fed. R. App. P. 32(a)(5)........................................................................59

Fed. R. App. P. 32(a)(6)........................................................................59

Fed. R. App. P. 32(a)(7)(B) ..................................................................59

Fed. R. Crim. P. 10(a)(3) ......................................................................54

Fed. R. Crim. P. 11(a)(1) ......................................................................54

## Other Authorities

Eleventh Circuit Pattern Jury Instruction 9.1A.....................................55

Fla. Std. Jury Instr. (Crim.) 3.6(f) ...........................................4, 6, 45, 49

Fla. Std. Jury Instr. (Crim.) 7.1 .................................................4, 39, 40

Fla. Std. Jury Instr. (Crim.) 7.2 ...............................................................4

Fld. Std. Jury Instr. (Crim.) 7.4...............................................................4

**STATEMENT OF JURISDICTION**

The United States District Court, Northern District of Florida, Tallahassee Division, had jurisdiction pursuant to 18 U.S.C. § 3231. After the jury's verdict of guilt for two felony offenses (ECF 125), the district court orally imposed judgment and sentence on January 23, 2023 (ECF 174) and entered written judgment and sentence on January 25, 2023. (ECF 151). Appellant filed a notice of appeal on January 26, 2023. (ECF 153). This appeal is from a final judgment or order that disposes of all parties' claims. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that the court of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States except where a direct review may be taken to the Supreme Court.

# STATEMENT OF THE ISSUES

## ISSUE I

On Count I (murder-for-hire), the trial court erred, reversibly, by denying Buselli's requested jury instructions indispensable to the determination of criminal wrongdoing.

## ISSUE II

The offense of knowingly and willfully making a false statement to a federal agency is plainly unconstitutional as applied here; the false statements were nothing more than the denial of guilt during police interrogation; applying the statute in this context infringed on Buselli's Sixth Amendment right to plead not guilty and demand trial by jury.

## ISSUE III

On Count II (knowingly and willfully making a false statement to a federal agency), the trial court erred, plainly, by relieving the jury of the duty to find Buselli acted willfully, i.e., with the intent to violate the law.

## STATEMENT OF THE CASE

(i)    <u>Nature of the Case and Statement of Incarceration</u>

This is the direct appeal of a felony judgment and sentence of imprisonment. Appellant is incarcerated.

(ii)    <u>Course of Proceedings and Dispositions in the Court Below</u>

Appellant, Gretchen Buselli, was charged in Count I with using a facility of interstate commerce "with intent that the murder" of B.B. be committed "in violation of" the laws of the State of Florida as consideration for a promise and agreement to pay anything of pecuniary value, between June 17, 2021, and September 16, 2021, in violation of 18 U.S.C. § 1958(a) and 2. (ECF 19). In Count II, Buselli was charged with the September 16, 2021, knowingly and willfully making two materially false statements in violation of 18 U.S.C. § 1001(a)(2). When asked who might have done anything to B.B., Buselli said: "I would never ask anyone to do something like this." Buselli also stated: "I don't want something to happen to him." (ECF 19—p 2).

After a jury trial, Buselli was found guilty on both Counts. (ECF 125). At sentencing, the district court found Buselli subject to a maximum guidelines range of 180 months in prison. The court achieved a maximum guideline sentence of 180 months by imposing the statutory maximum term of ten years (120 months) on

Count I, and a consecutive term of five years (60 months) on Count II. (ECF 151—p 2).

    (iii)   <u>Statement of the Facts</u>

Prior to trial, questions regarding jury instructions took center stage. (ECF 177). The government proposed instructions largely tracking the language of 18 U.S.C. § 1958(a).

> The Defendant used … a facility of interstate commerce with the intent that a murder be committed in violation of the laws of the State of Florida.

(ECF 66—p 7). And the government defined "murder" as "the unlawful, premeditated killing of a human being with malice aforethought." (ECF 66—p 7).

Defense counsel, on the other hand, proposed instruction on excusable homicide and "justifiable use of deadly force." (ECF 79—pp 3-4). Counsel asserted such instruction was necessary to "properly instruct the jury as to what constitutes a murder in violation of the laws of the State of Florida," citing *Hill v. State*, 688 So. 2d 901 (Fla. 1996); Fla. Stat. §§ 776.012, 782.02, 782.03, and 782.04; Florida Pattern Criminal Jury Instructions 7.1, 7.2, 7.4, and 3.6(f). (ECF 79—p 2). Due to the sharp divergence in requested instructions, the court continued the trial. (ECF 178—p 70).

Buselli subsequently argued instruction on justifiable homicide, excusable homicide, and justifiable use of deadly force is required in every homicide case, citing *Hill v. State*, 688 So. 2d 901, 906 (Fla. 1996), and *Blandon v. State*, 657 So. 2d 1198, 1199 (Fla. 5th DCA 1995). (ECF 96—p 2). Such instruction is required to permit the jury to distinguish between lawful and unlawful killings. (ECF 96—p 2). Specifically, the same rationale applies to justifiable use of deadly force because where deadly force is justified, "the killing is lawful and, therefore, not murder under Florida law." (ECF 96—p 3).

In the alternative, defense counsel said he anticipated the jury will hear evidence sufficient to support instruction on justifiable use of deadly force, i.e., evidence the alleged victim abused Buselli's daughter and would continue to do so. (ECF 96—p 4). The instruction would be particularly appropriate because justifiable use of deadly force, unlike justifiable homicide, incorporates "defense of others." (ECF 96—pp 4-5). The instruction is necessary to assist the jurors in distinguishing lawful and unlawful killings, citing *Blandon* and *Ruan v. United States*, 142 S. Ct. 2370 (2022). (ECF 96—pp 5-6).

The government argued Florida law does not require instruction on justifiable homicide and excusable homicide in every homicide case. (ECF 95—p 1). Buselli was not charged with murder (or attempted murder) under Florida law. (ECF 95—p

5

4).  She was charged with a violation if § 1958 which requires use of a means of interstate commerce to facilitate a murder, which would be against the law in Florida. (ECF 95—p 4).  Moreover, the government said there would be no evidence to support the instructions requested by the defense. (ECF 95—pp 4-5).

The government also argued the reference to "murder" in § 1958 is a "commonplace" term that "does not require an expansive or unnecessarily complex legal explanation." (ECF 95—p 12).  The complexities of Florida law in local homicide trials "are neither implicated nor at issue as they might be … in an actual homicide trial before a Florida trial court." (ECF 95—p 12).

At hearing before trial, the district court asked two basic questions.  The first was whether Florida law required jury instruction on justifiable homicide and excusable homicide (7.1) in every homicide case? (ECF 177—p 2).  The second was whether Florida law required jury instruction on "justifiable use of deadly force" (3.6 (f)) in every homicide case? (ECF 177—p 3).  The court suggested that "justifiable use of deadly force" is treated differently than justifiable homicide and excusable homicide in that the instruction (3.6 (f)) is not given "unless there is evidence to support it." (ECF 177—p 3).  The district court noted that justifiable use of deadly force is a defense whereas, justifiable and excusable homicide are part of the definition of the crime. (ECF 177—pp 5-6).

6

Defense counsel stated that Florida law always requires instruction on excusable and justifiable homicide absent an express waiver by the defendant, regardless of whether there is evidence to support the instructions. (ECF 177—pp 3-4). This is necessary to distinguish between lawful and unlawful killings. The same principle applies to justifiable use of deadly force. (ECF 177—p 11). The deadly force instruction is likewise necessary to distinguish lawful from unlawful killings. (ECF 177—pp 6, 9). And the federal crime requires the jury to make such a distinction because it requires proof of intent to commit a murder "in violation of" Florida law. (ECF 177—pp 6-7). Counsel added, in any event, he expected the admission of evidence to support the instruction on justifiable use of deadly force. (ECF 177—p 9). The district court opined there is no Florida decision that requires instruction on justifiable use of deadly force absent evidence to support it. (ECF 177—pp 9-12).

The court ruled, orally, that Florida law requires instruction on justifiable homicide and excusable homicide in every case, so such instruction would have to be given here. (ECF 177—pp 14-15). But "justifiable homicide" should not be confused with "justifiable use of deadly force." They are different legal concepts. An instruction on justifiable use of deadly force should not be given unless there is "some evidence to support it." (ECF 177—pp 15, 16).

7

The district court later asked defense counsel "what legal principal requires me to give the full definition that would be required under Florida law?" (ECF 177—p 39). Counsel noted the statute plainly requires proof of "the intent that a murder be committed in violation of the laws of Florida." (ECF 177—pp 39, 41). "It follows from the plain statutory language of 1958 …." (ECF 177—p 41).

The district court made one more inquiry with respect to justifiable use of deadly force. "Isn't murder-for-hire by definition something that's planned and not addressing something that's imminent [as required under justified use of deadly force]? (ECF 177—p 57). Defense counsel said the question was whether there was sufficient evidence to instruct the jury on the defense. (ECF 177—p 57).

In its written order, the district court opined Florida law requires jury instruction on justifiable homicide and excusable homicide in all homicide prosecutions "absent an explicit concession" that the instructions do not apply. (ECF 111—pp 2, 5). However, an instruction on "justifiable use of deadly force" is a different concept, and the instruction does not apply where there is no evidence to support it. (ECF 111—pp 2-4). To get this instruction, the defense must present evidence to support it. (ECF 111—p 4). Turning to justifiable and excusable homicide, the defense would not present evidence, or argue, either law applies. (ECF 111—p 6). Therefore, the court would not instruct the jury on justifiable or

excusable homicide (unless evidence is presented in support thereof). (ECF 111—p 6).

## *Trial Proceedings*

In opening statements, the prosecutor said the evidence would show Buselli was troubled about her deteriorating marriage. She was separated from her husband, and complained her husband was abusing their young child. (ECF 170—p 32). She reported the abuse to the police and Child Protective Services, but no one did anything about it. (ECF 170—pp 32-33). She felt she had no choice and attempted to persuade Christopher Colon to kill her husband for $30,000. (ECF 170—p 33).

Colon contacted law enforcement. FBI agents subsequently instructed Colon to refer Buselli to a third party more suitable to the job. Buselli agreed, and called "Paul," who was, in reality, an FBI agent. (ECF 170—pp 38-39). Buselli agreed to pay Paul $5,000 in advance, and $20,000 when the job was done. (ECF 170—p 39). Paul agreed to come to Tallahassee to scout out the job. Buselli agreed to drop off $5,000 at the amphitheater in Cascades Park, at a specific row and seat. (ECF 170—p 40). Buselli made the drop, unaware she was being surveilled by authorities. (ECF 170—pp 40, 41).

Paul later phoned Buselli to inform her: "The deal is done. It's all done." ((ECF 170—p 42). A day later, police went to Buselli's house under the guise of

investigating the disappearance of her husband. She followed investigators to the police station for questioning. She claimed to know nothing about the disappearance. "I wouldn't want anything to happen to him." (ECF 170—p 44). Investigators then showed Buselli photos of her making the drop at Cascades Park and she was arrested. (ECF 170—pp 45, 49).

The prosecutor said the jury would hear evidence that Buselli complained her husband had been sexually or physically abusing her daughter. (ECF 170—p 45). But those claims were investigated, and authorities ultimately concluded the charges were false. (ECF 170—pp 49).

Defense counsel said the evidence would show Buselli did not have the intent to murder her husband. (ECF 170—p 52). When Buselli called Colon and explained about her marital problems, it was Colon who made a comment about killing her husband, Bradley. Buselli did not take Colon seriously. (ECF 170—p 52). Buselli told Colon about concerns of her young daughter being abused. (ECF 170—p 53). She did not think law enforcement was taking her concerns seriously. (ECF 170—p 53). She had provided recordings of her daughter's complaints of abuse to law enforcement, but nothing happened. (ECF 170—p 53).

In a subsequent phone call, Colon mentioned coming to Florida and killing Bradley, but Buselli rejected the idea. (ECF 170—p 54). Colon nonetheless made a

report to the Tampa police. (ECF 170—p 54). Colon falsely represented that Buselli offered him $40,000 to kill her husband. (ECF 170—p 54). And he falsely stated that Buselli knows he is a bad guy who had served time in prison. (ECF 170—p 54). Colon later gave the same false information to the FBI. (ECF 170—p 55).

In a recorded conversation, Colon talked about coming to Florida and confronting Bradley. (ECF 170—p 55). Buselli made some regrettable comments after drinking alcohol but did not intend to have Bradley killed. (ECF 170—p 56). Buselli sent Colon $1,000 to come to Florida, but he did not come. (ECF 170—p 56). She felt she was duped into giving money to Colon. (ECF 170—p 56). And then she was referred to "Paul." (ECF 170—p 56). Paul was described as a hit man, and she was frightened of him. (ECF 170—p 57). She thought this was another attempt to extort money from her. (ECF 170—p 57). When she delivered $5,000 to Cascade Park, Buselli thought she was just getting rid of Paul, and she did not think Paul would kill her husband. (ECF 170—p 57). Buselli was truthful when she said she would never ask anyone to kill for her, and she didn't want anything bad to happen to Bradley. (ECF 170—p 57).

Gretchen Buselli testified in her own defense. (ECF 172—p 546). Buselli said she never intended to have Bradley killed when speaking with Colon. (ECF 172—p 547). Also, when speaking with Paul (undercover agent) she never intended to have Bradley killed. (ECF 172—pp 547-58). When she mailed the gift cards to Colon, and when she dropped $5,000 at Cascades Park, she did not intend to have her ex-husband killed. (ECF 172—p 548).

Colon was an old boyfriend when Buselli was a teenager. They reconnected on Facebook. (ECF 172—p 548). Colon talked about making a trip to Florida. (ECF 172—p 549). Prior to the recorded calls, Buselli shared some details of her marital problems with Colon. (ECF 172—p 551). Almost immediately, Colon asked if she wanted him to come down and kill Bradley. (ECF 172—p 551). She viewed this as a "derogatory remark" that she did not take seriously. (ECF 172—pp 551-52). In another conversation later that day, Colon proposed coming to Florida and shooting Bradley through the door. (ECF 172—p 552). Buselli flatly rejected the suggestion. (ECF 172—p 553).

Buselli explained that she used the Signal app because her husband's attorney had subpoenaed her personal information during the divorce proceedings. Signal gave her more privacy. (ECF 172—pp 554-55). Prior to the recorded call of July

9th, Colon asked Buselli if she wanted him to come down to beat up her husband. "You want me to beat him up?" (ECF 172—p 555). Buselli said no and declined to Colon's repeated requests for Bradley's address. (ECF 172—p 555). Nor did she encourage Colon's request for the opportunity to "confront" Bradley. (ECF 172—p 556).

Buselli had drunk quite a bit of red wine on the night of the July 9th phone call. (ECF 172—p 557). Buselli was extremely concerned that DCF and the court system were not taking her allegations of child abuse seriously. (ECF 172—p 558). During the call Buselli "vented" about killing Bradley. (ECF 172—p 558). But it was not a "true intent." (ECF 172—p 559). Colon had brought the subject up, and Buselli had been drinking quite a bit. (ECF 172—p 559). Later in the call, however, Colon admitted that he was just kidding; he was not serious about it. (ECF 172—p 559). Alluding to a previous call, Colon suggested: "How about I just come down there and confront him." (ECF 172—p 560). They were "all over the place on that call." (ECF 172—p 560). They went to burner phones only at Colon's suggestion. (ECF 172—p 560). "If he was coming down, I was willing to let him confront Bradley." (ECF 172—p 561). Buselli had been working with law enforcement and state agencies in an effort to protect her daughter from Bradley's abuse. (ECF 172—pp 562-63).

Buselli admitted sending gift cards to Colon for "gas money." (ECF 172—p 563). Colon was coming to Florida, anyway, and she expected to have more conversations with him. (ECF 172—pp 563-64). Buselli provided Bradley's address to Colon only after she agreed to let Colon "confront him—not murder him." (ECF 172—p 564).

In their next conversation (August 20), Colon brought up another individual—Paul. (ECF 172—p 565). When Colon mentioned Paul, Buselli immediately thought Colon had ripped her off for a thousand dollars because he did not offer to give the money back. (ECF 172—p 565). Buselli stated repeatedly that she did not want to talk to Paul or have anything to do with him. (ECF 172—pp 565-66). Colon described Paul as a "pretty bad character," a drug smuggler or something. Buselli did not want to get involved with Paul. (ECF 172—p 566). Buselli agreed to talk to Paul in order to "dissuade" him. She thought he was going to ask for money. (ECF 172—pp 567-68).

Buselli told Paul she could not just "pull money out of the bank." (ECF 172—p 568). Paul asked for $20,000 and asked horrible questions that Buselli did not anticipate. (ECF 172—p 568). She was terrified, "really terrified." (ECF 172—p 568). "Really, I was scared." (ECF 172—p 569). She hesitated to give him Bradley's address, and pretended she had to check on the internet. (ECF 172—p

569). Ultimately, however, she realized that he and Colon had already talked about it. (ECF 172—p 569).  Still, Buselli did not intend to have Bradley killed. (ECF 172—p 569).

Buselli made the $5,000 payment because she did not believe Paul was actually going to kill Bradley. (ECF 172—p 570).  She didn't believe the boat story; she thought it was ridiculous. (ECF 172—p 570).

> Who is going to bring a boat from five hours away to Tallahassee, murder somebody, make them disappear for $5,000 for a lady that doesn't know how or if or when she would—he's willing to take a payment plan.  I'm like, I've never talked to a hit man or I don't know anything about these things, but it seemed—it seemed like a fraud scam to me is what it seemed like.

(ECF 172—p 570).  Nonetheless, Buselli was willing to pay the money "because I was very scared of him, but I had—I hadn't come up with a good way of how to get out of this." (ECF 172—p 571).

> I thought I'd never hear from him again.  He'd steal my $5,000.… The only thing I could think of, was, of course, I'm going to be totally cool and cooperate with this guy and make him think that I'm not suspicious to him.  I'm not going to report him or Chris.  And I'm going to give him his money.

(ECF 172—p 571).  She though Paul would simply disappear with her money. (ECF 172—p 571).  She thought her plan was a lot safer than saying she did not have the money and backing out. (ECF 172—p 572).  And at the end of the conversation,

"Paul" threatened her. He said: "[I]f he wanted to know what I looked like or find me, he already could have." (ECF 172—p 572).

> And right there I'm like, this is extortion. It terrified me.
> So I'm just like, you know, I'm going to do it. I'm just
> going to do it. I was absolutely confident at that point that
> Bradley was in no danger.

(ECF 172—p 572). So, she made the $5,000 payment at Cascades Park. (ECF 172—p 572).

When Paul later called and said it was done, Buselli was shocked. (ECF 172—p 573). She did not expect to hear from him again, but she believed him. (ECF 172—p 573). She said: "thank you," "but that wasn't genuine for sure." (ECF 172—p 573). Buselli suggested her voice, on the recording, shows her shock and dismay. (ECF 172—p 573). She could not believe he did it. (ECF 172—p 574). Finally, Buselli repeated that she never intended to have Bradley killed. (ECF 172—p 576).

On cross-examination, Buselli said that when she spoke of Bradley disappearing, she did not believe that would happen; she did not think either Colon or Paul would harm him. (ECF 172—p 579). The payment of $5,000 was not for the purpose of making Bradley disappear. (ECF 172—p 580). The $5,000 payment was the product of extortion because Paul had threatened her. (ECF 172—pp 582, 601, 602). She thought it would make Paul go away. (ECF 172—pp 582, 592). Paul said: "If I wanted to know what you looked like or if I wanted to find you, I could

16

have by now." (ECF 172—p 580).  Buselli testified that she told Colon not to hurt Bradley, but that was before the first recorded phone call. (ECF 172—p 583).

When she sent $1,000 to Colon, Buselli was willing let him "intervene," but not murder, Bradley. (ECF 172—p 588).  She sent Colon information about Bradley because she was "willing to let him confront Bradley." (ECF 172—p 589).  She thought Chris would make some "threatening remarks." (ECF 172—p 589).  Buselli set a date for paying the remaining $20,000 to Paul because he was in town, had threatened her, "and he had just murdered someone, I don't want him coming after me." (ECF 172—p 590).  When she went to Cascades Park, she wore a disguise because she assumed Paul would be watching, and she did not want him to know what she looked like. (ECF 172—p 591).  She chose Cascades Park because it was a public place and she thought she would be safer there. (ECF 172—p 591).

When the conversation with Colon turned from breaking bones to making Bradley disappear, Buselli went along with it because she thought Colon might follow through with breaking bones but never expected him to follow through with bringing a boat from South Florida and actually murdering Bradley. (ECF 172—p 593).  Nonetheless, Buselli said she only asked Colon to confront Bradley, not to beat him up. (ECF 172—p 593).

The government called Patrick Sanford, an FBI agent in Tallahassee. (ECF 170—p 62). Sanford received a call from the Tallahassee Police Department (TPD) about a possible murder-for-hire scheme. (ECF 170—p 66). Investigator Bennett, of TPD, made a recorded phone call to Colon to confirm his allegations. (ECF 170—pp 67-68). Bennett advised Colon that an FBI agent may call him to follow up. (ECF 170—p 68). The alleged intended victim was Bradley Buselli. (ECF 170—pp 69). Bradley and Gretchen Buselli were married but living apart. (ECF 170—p 69). They had one daughter, Z.B., about 5 years old. (ECF 170—p 70). TPD notified Bradley of a potential threat to his life. (ECF 170—p 71).

TPD was aware of complaints of physical or sexual abuse against Z.B. (ECF 170—p 70).

Sanford contacted an FBI agent in Salt Lake City, Levi Kroschel, to engage with Colon. (ECF 170—p 74). The plan was to conduct a controlled phone call, and have Colon tell Buselli he was willing to make the hit. (ECF 170—p 75). The agents discovered Colon had a lengthy criminal history. (ECF 170—p 76). Colon informed the agents that Buselli wanted to use "Signal" app, which means law enforcement would not be able to intercept their conversations. (ECF 170—pp 78-80). The agents, therefore, used hand-held recorders to record the conversations. (ECF 170—p 81). They were also able to take "screen shots" of text messages. (ECF

170—p 82). The agents had Colon suggest the use of burner phones; he did, and Buselli agreed. (ECF 170—pp 85-86).

Sanford testified that the subsequent recorded phone calls confirmed that Buselli hired Colon to kill her husband. (ECF 170—pp 86-87). Colon told Buselli he needed money to travel to Tallahassee. (ECF 170—p 87). Buselli suggested mailing prepaid debit cards to Colon for that purpose. (ECF 170—p 87). The agents talked with postal inspectors to arrange the interception of those packages. (ECF 170—p 89).

FBI Agent Levi Kroschel confirmed that he met with Colon and conducted a controlled phone call with Colon at Agent Sanford's request. (ECF 170—pp 96-97). Kroschel gave a recording device to Colon, and later learned that a conversation between Colon and Buselli had been recorded. (ECF 170—p 105) (Gov. Exh. #2). Law enforcement intercepted two prepaid Visa cards mailed to Colon from Buselli. (ECF 170—p 113) (Gov. Exh. #6, 6A, 7, 8, 8A). Buselli also mailed to Colon an envelope containing a photograph of her husband along with his home address, work address, and vehicle information. (ECF 170—pp 89, 115) (Gov. Exh. #9).

On cross-examination, Kroschel said he did not remember Colon mentioning the figure of $40,000 as the amount offered to kill Bradley Buselli. (ECF 170—p 122). Kroschel was not actually present when Colon recorded the conversation with

Buselli. (ECF 170—p 122). Kroschel would not know if Colon and Buselli had any conversations that were not recorded. (ECF 170—p 122). Kroschel did not give a burner phone to Colon. (ECF 170—p 123). On the Signal app, Colon had the ability to delete messages, and Kroschel would not know if any messages between Colon and Buselli had been deleted. (ECF 170—pp 124-25). Colon is a convicted felon, and Kroschel had no knowledge whether Colon was in possession of any firearms. (ECF 170—pp 127-28). Kroschel also had no knowledge of whether Colon had traveled to Florida. (ECF 170—p 129).

On redirect Kroschel said Colon had disabled the "disappearing messages" feature. (ECF 170—p 131). But he did not know whether Colon had enabled the "disappearing messages" feature at a later time. (ECF 170—p 131). Kroschel had no reason to believe Colon had been in possession of a firearm. (ECF 170—p 132).

Agent Sanford returned to the witness stand. Government Exhibit #2A is a transcript of the phone call between Colon and Buselli that occurred on July 9, 2021. (ECF 170—pp 137, 140) (Gov. Exh. #2A) (ECF 123-3—p 16). The recorded call (Gov. Exh. #2) was played for the jury. (ECF 170—p 143).

Colon said some of the conversation would be serious and some would be joking. (ECF 123-3—p 17). Buselli said she had accused Bradley of touching her daughter. (ECF 123-3—p 17). Z.B. had reported the same to her domestic violence

20

counselor. (ECF 123-3—p 17).  Three counselors had reported the abuse to child protective services, but they did nothing about it. (ECF 123-3—p 17).  Buselli wanted to bring this up in the child custody case, but the judge did not want to deal with it. (ECF 123-3—p 18).  At age four, Z.B. said: "Daddy makes me pick out tools and he's hitting me with them." (ECF 123-3—p 20).  "Daddy pins my legs down and unzips my pants." (ECF 123-3—p 21).  And she has come home with bruises all over her. (ECF 123-3—p 21).  She said her father "puts a hole in her butt and he hurts her." (ECF 123-3—p 21).  Her daughter said Bradley had punished her for wetting her pants by "hitting her on the vagina with his hand and with wrenches." (ECF 123-3—p 22).  "She told me in detail that her dad put his hand down her pants and pushed on her." (ECF 123-3—p 22).

Buselli complained about the divorce proceedings. (ECF 123-3—pp 22-23).  She wanted a custody hearing because her daughter was "not safe with this man." (ECF 123-3—p 23).  Buselli wondered whether she should continue to fight the family law case. (ECF 123-3—p 23).  She may have been better off settling the case than paying $40,000 to her attorney.  "I would have rather paid 40,000 dollars to end it a year ago than an attorney." (ECF 123-3—p 23).  Buselli had already spent $40,000 with no results. (ECF 123-3—p 26).

When Colon intimated he would come down to Florida to "take care of" Bradley, Buselli just laughed. (ECF 123-3—p 24). Colon said he would "hurt him bad." (ECF 123-3—p 25). "He is going to be terrified." (ECF 123-3—p 26). Colon said he would "dump his ass off in the water." (ECF 123-3—p 29). Buselli said: "[T]hen it just looks like he disappeared, it's not going to trigger a homicide investigation immediately." (ECF 123-3—p 29).

Colon asked for money for traveling expenses and hotel rooms. (ECF 123-3—p 30). Buselli said she would mail him "ghost credit cards." (ECF 123-3—p 30). Colon said the expenses would be five to six thousand dollars. (ECF 123-3—p 30). Buselli said "cool" and laughed. (ECF 123-3—p 31). Buselli cautioned Colon to make sure he didn't get caught putting her husband in the vehicle. (ECF 123-3—p 36). Dumping him in the ocean would leave "no trace." (ECF 123-3—p 37). Colon asked if he should put him on a boat and get rid of his ass. (ECF 123-3—p 38). Buselli said: "[I]f you can do that without getting caught," laughing. (ECF 123-3—p 38). When Colon said the sharks would get him, Buselli laughed and said the closest ocean is 45 minutes away. (ECF 123-3—p 48). Buselli said the conversation made her "feel better." (ECF 123-3—p 31).

Buselli told Colon to make sure it doesn't happen when her daughter is present. (ECF 123-3—p 38). Colon said: "Of course not." (ECF 123-3—p 38).

Buselli said she did not call to talk about killing Bradley. (ECF 123-3—p 49). She "just kinda' started bullshitting about this," and Colon said: "I'll fucking kill him." (ECF 123-3—p 49). Colon denied saying that. (ECF 123-3—p 49). Buselli thought Colon was "making a joke." (ECF 123-3—p 50). Colon said: "I was just fucking around." (ECF 123-3—p 50).

Colon asked Buselli what would happen if he showed up at Bradley's house and said: "I'm her new boyfriend, and I don't appreciate what you're doing." (ECF 123-3—p 52). Buselli said he would call his lawyer and claim he had been threatened. (ECF 123-3—p 52).

The two talked about buying burner phones, and then planned to talk some more. (ECF 123-3—pp 56-57).

Returning to the witness, Sanford testified that Lisa Runde could not provide any information to confirm Buselli's allegations of child abuse. (ECF 170—p 143). Although Buselli said she had been thinking about this for a year, the allegations of child abuse did not begin until perhaps the spring of 2021. (ECF 170—pp 143-44). And the allegations were confined to physical abuse, not sexual abuse. (ECF 170—p 144). Colon gave Buselli opportunities to back out of the plan, but she did not. (ECF 170—p 145). Further investigation revealed that Buselli purchased the prepaid debit cards and burner phone mailed to Colon. (ECF 170—pp 159-67). All of the

23

text messages between Colon and Buselli are documented on Government Exhibits # 13 and 13A. (ECF 170—p 173).

Sanford proposed taking the operation away from Colon and transferring it to an undercover agent. (ECF 170—p 174). He told Colon to tell Buselli it would be better if the job were undertaken by a stranger. (ECF 170—pp 175-76). Colon called Buselli and suggested turning the job over to "Paul." (ECF 170—p 178) (Gov. Exh. #14, 14A) (ECF 123-4—pp 24-25). Colon said he would not be traveling to Florida. (ECF 123-4—p 25). The body would be dumped in deep water so it would not be found. (Gov. Exh. #14A) (ECF 123-4—p 33). But Paul did not know anything about Colon's plan yet. (ECF 123-4—p 34).

Subsequent phone calls and text messages occurred between Buselli and "Paul." (ECF 170—p181-84) (Gov. Exh. #15, 15A, 15B, 15C). One of the text messages informed Paul of Bradley Buselli's home address. (ECF 170—p 185) (ECF 123-4—p 61). In another, Buselli said she could make the initial payment of $5,000 at Cascades Park in Tallahassee. (ECF 168—p 198-99) (Gov. Exh. #16, 16A) (ECF 123-4—p 62). The remaining fee would be $20,000. (Gov. Exh. #16, 16A) (ECF 123-4—p 64). They agreed the $20,000 could be paid in gold coins. (ECF 123-4—pp 64-65). Paul told Buselli to "make the drop tomorrow morning" [September 12] at 10:30 a.m. (ECF 170—p 200) (ECF 123-4—p 60). Buselli said:

"Okay." (ECF 170—p 200) (ECF 123-4—p 60). Sanford had made arrangements for surveillance, including an airplane with camera equipment. (ECF 170—pp 200-202). Paul did not travel to Tallahassee to pick up the cash. That was to be done by Sanford. (ECF 170—pp 205-206).

The following day, the jury saw video of Buselli driving from her house to Cascades Park. (ECF 171—p 235) (Gov. Exh. #18A). Buselli parked her car near the park and exited her vehicle. (ECF 171—p 237) (Gov. Exh. #18A). She then entered the amphitheater at the predetermined time and dropped the money at the predetermined location before returning to her vehicle (ECF 171—pp 237-41, 264). (Gov. Exh. #18A). After leaving Cascades Park, Buselli stopped to dispose of clothing at a couple of locations before returning home. (ECF 171—pp 242-50, 260, 261).

Shortly afterward, Agent Sanford retrieved the package Buselli had left at the amphitheater. (ECF 171—p 256). The package proved to be a lunchbox containing $5,000 in cash. (ECF 171—p 258).

Law enforcement later took Bradley Buselli to a hotel to make it look as though he had disappeared. (ECF 171—p 265). He did not go to work the next day. (ECF 171—p 266). And he did not call his daughter that evening as planned. (ECF 171—pp 266-67).

The next day, September 16, the undercover officer (Paul) texted Buselli. He informed her: "It's done." Buselli said thank you and told him she would contact him "in one month to get you another package." The officer said: "It was quick and clean, and he had no idea what it was about." (Gov. Exh. #22A) (ECF 123-5—pp10-11).

That same afternoon, Agent Sanford and Officer Bennett went to Buselli's house. (ECF 171—p 274). They engaged in a ruse, explaining that her husband may have been abducted, and asked her to follow them to the police station to discuss the matter. Buselli complied, taking her daughter with her. (ECF 171—pp 271-78). Sanford had already obtained warrants for Buselli's arrest and a search of her house. (ECF 171—pp 288, 203) (ECF 123-6)—p 84).

Buselli was informed of her Miranda rights. (ECF 123-6—p 5). She was told Bradley was missing. (Gov. Exh. #24A) (ECF 123-6—p 4). Buselli gave a long account of her history with Bradley and their marital problems. Sanford asked if Buselli knew anyone that may have wanted to harm Bradley. She said no. (ECF 123-6—p 32). He asked if she wanted this to happen. She said no. (ECF 123-6—p 33). Buselli said she did not ask anyone to do this on her behalf. (ECF 123-6—p 40).

Sanford told Buselli it is a crime to lie to a federal agent. (ECF 123-6—p 41). Buselli said: "I would never ask anyone to do something like this." (ECF 123-6—p 41). "I don't want something to happen to him." (ECF 123-6—p 44). She would not do something to Bradley because of what he did to her daughter. (ECF 123-6—p 45). Nor would she harm him just to facilitate moving back to Oregon. (ECF 123-6—p 48). She did not do anything to cause him to be assaulted or disappear. (ECF 123-6—pp 49, 56). She would not have asked anyone to harm her husband. (ECF 123-6—pp 58-59).

Sanford later showed Buselli some photos from Cascades Park and said he knew she was lying. (ECF 123-6—p 63). He recovered the lunchbox and the money. (ECF 123-6—p 64). When informed Brad was not dead, Buselli replied: "Good." (ECF 123-6—p 64). Asked why she would want him dead, Buselli replied: "He's molesting my daughter." (ECF 123-6—pp 64-65).

Buselli was placed under arrest. (ECF 123-6—p 84).

In his testimony, Sanford said Buselli lied to him when she said she would never ask anyone to harm Bradley, and again when she said she did not want anything bad to happen to him. (ECF 171—p 298). Sanford would not have released Buselli's daughter to Bradley if he thought she was in danger. (ECF 171—p 307). The search of Buselli's house revealed a number of gold coins. (ECF 171—p 315).

On cross-examination, Sanford testified that Colon initially claimed that Buselli contacted him "out of the blue" about killing her husband. (ECF 171—p 324). Facebook records indicate, however, that Colon had been communicating with Buselli as far back as January 21, 2021. (ECF 171—p 327). And Colon jokingly suggested he could "get rid of" Bradley for Buselli. (ECF 171—pp 327-28). But Colon did not tell law enforcement it was he who first raised the idea of killing Bradley. (ECF 171—p 328). The records show, however, that someone deleted Colon's messages during that relevant period in April and May of 2022. (ECF 171—p 329) (Def. Exh. #1-4). Although Colon claimed Buselli offered him $40,000, the record suggests the $40,000 was mentioned in connection with her costs for attorney's fees in the divorce litigation. (ECF 171—pp 330-31). There was no specific agreement on price. (ECF 171—p 331). Speaking with Investigator Bennett, Colon said "I can set her up for you." (ECF 171—p 332).

On June 18th, Colon sent Buselli a photo of himself holding a gun. (ECF 171—p 337). Buselli is a convicted felon and not permitted to possess a firearm. (ECF 171—p 337). Colon was not charged with any crime in connection with the investigation. (ECF 171—p 338).

Although Colon discussed traveling to Florida to kill Bradley, he did not make the trip. He did not kill or attempt to kill Bradley. (ECF 171—p 344). As the

28

investigation was turned over to the undercover agent, "Paul," Buselli understood him to be a dangerous person. (ECF 171—p 347). Although Buselli sent money to Colon, he did not use it to travel to Florida. (ECF 171—p 347).

Although Buselli did not want Paul to know who she was, Paul proclaimed: "If I really wanted to know who you are and what you look like, I could figure that out already, you know what I mean." (ECF 171—p 349) (Gov. Exh. #16A) (ECF 123-4—p 66). This came from a person portrayed as a killer. (ECF 171—p 349).

On the July 9th call, Colon suggested he may come down and beat up Bradley rather than kill him. (ECF 171—p 351). And when Sanford told Buselli that Bradley was not dead, her first response was "good." (ECF 171—p 357).

On redirect, Sanford said Colon was not charged with any offense because he did not commit any offense. (ECF 171—p 360). Buselli never expressed any fear of the hitman, Paul. (ECF 171—p 362).

Charzetta Felton-Stevens is a Tallahassee police officer who used to investigate cases including child sexual abuse. (ECF 171—pp 373-74). In September of 2020, she responded to a call from Buselli to the police. (ECF 171—pp 376-77, 380). Buselli complained of physical abuse by the child's father. (ECF 171—pp 377-78). Complaints of vaginal discharge and urination were not verified because the child's underwear had been cleaned. (ECF 171—p 379-80). Buselli was

able to provide a recording of her child speaking about abuse. (ECF 171—p 380). Felton-Stevens referred the child to the Children's Home Society for a forensic interview. (ECF 171—p 382).  After the forensic interview, no arrest was made. (ECF 171—pp 383-84).

On cross-examination, Felton-Stevens said Officer Sheats was already on the scene when she arrived.  Sheats had already viewed the recorded allegations of abuse.  Felton-Stevens declined two opportunities to view the audio recordings of abuse allegations. (ECF 171—pp 389, 393).  Buselli reported the child had been seen at the doctor's office in regard to the discharge. (ECF 171—p 392).  Buselli gave the recordings to Officer Sheats. (ECF 171—p 394).  Buselli offered to let the officer speak with the child, but Felton-Stevens declined the offer. (ECF 171—p 392).

Annalise Spotts is a case coordinator and forensic interviewer with the Child Protection Team of the Children's Home Society of Florida. (ECF 171—pp 402-06). Spotts conducted a forensic interview of Buselli's daughter on September 29, 2020. (ECF 171—p 412).  Spotts did not review Buselli's recordings of Z.B.'s allegations because they were "created" by Buselli. (ECF 171—p 410).  Spotts did not observe any signs of physical abuse. (ECF 171—p 412).  Z.B. did not disclose any abuse. (ECF 171—p 415).  After the interview, Spotts spoke with Buselli. (ECF 171—p 416).  Buselli indicated Z.B. had undergone medical examinations. (ECF 171—p

416).  But Spotts did not know if those exams resulted in any findings consistent with allegations of abuse. (ECF 171—pp 416-17).  Spotts made no recommendation regarding changes to the custody of Z.B. by her father. (ECF 171—p 418).

Necia Little works for the Department of Children and Families. (ECF 172—p 443).  She is the operations manager for the child protective investigators. (ECF 172—p 443).  Her agency conducted three investigations in regard to complaints of physical and sexual abuse of Z.B. by her father, filed by Buselli. (ECF 172—p 464).  In each case, investigators concluded there was no indication of physical or sexual abuse. (ECF 172—pp 451-64).  Buselli was dissatisfied.  She felt the agencies had not done their due diligence. (ECF 172—p 464).

## *Charge Conference*

At the charge conference, defense counsel renewed his objections, as previously stated, to the denial of the standard Florida instructions on use of deadly force. (ECF 172—pp 627-630).  The district court restated its rulings explained in ECF 111. (ECF 172—p 630).  The court denied the defense request for instruction on excusable and justifiable homicide. (ECF 172—p 630).  The court opined that no party "has suggested the law or the facts would support an argument for justifiable or excusable homicide." (ECF 172—p 631).  And the court opined there was "no evidence" to support either instruction. (ECF 172—p 631).

Turning to the request for instruction on "justifiable use of deadly force," the judge said that was a different concept since it was a defense rather than something required to distinguish a lawful killing from an unlawful killing. (ECF 172—pp 631-32). The defense argued there was evidence to support this instruction. (ECF 172—p 633). Defense counsel argued evidence was presented that deadly force was justified to prevent "the commission of a forcible felony." (ECF 172—p 635). The judge rejected the argument because of a lack of evidence that a forcible felony was "imminent." (ECF 172—p 638). As stated by the district court, the law does not permit one to "murder a child molester because the government wasn't taking adequate steps to investigate and/or arrest the perpetrator." (ECF 172—p 639).

## *Jury Instructions*

The court instructed on the elements of Count I:

1. The defendant used the mail or a facility of interstate commerce on or about the dates described in the indictment;

2. With the intent that the murder be committed in violation of the laws of the State of Florida; and

3. In return for anything of pecuniary value or in return for a promise or agreement to pay anything of pecuniary value.

(ECF 173—p 659). The court defined "murder" as:

> Murder is the unlawful, premeditated killing of a human being with malice aforethought and is a violation of the laws of the State of Florida.

32

(ECF 173—p 659).

On Count II, the jury was instructed on the following elements:

1. The defendant made the statement as charged;

2. The statement was false;

3. The falsity concerned a material matter;

4. The defendant acted willfully, knowing that the statement was false; and

5. The false statement was made or used for a matter within the jurisdiction of a department or agency of the United States.

(ECF 173—p 660). The jury was also instructed that unanimity was required as to each of the two false statements charged. (ECF 173—pp 661, 663-64).

*Closing Argument*

In closing argument, the prosecutor argued the government had satisfied its burden to prove beyond a reasonable doubt that Buselli intended to kill her ex-husband, Bradley. The documentary evidence, including the recorded phone calls and text messages, and her conduct in dropping off the money at Cascades Park, proved the point. (ECF 173—pp 671-77). Had she been successful, she would have committed a murder in violation of Florida law. (ECF 173—pp 675-76).

As to Count II, the prosecutor argued, with specific reference to the fourth element, that Buselli acted "willfully, knowing the statement was false." (ECF 173—

33

p 679).  The evidence showed Buselli plotted to kill Bradley and devised a plan to do it without getting caught. (ECF 173—p 679).  There is no doubt that she lied about not wanting to hurt Bradley.  She knew she lied because she planned to "make false statements to prevent herself from being caught." (ECF 173—p 679).  "There's no doubt that the lies were willful because she tells you, in the earlier evidence admitted in this case, that she's going to lie." (ECF 173—p 679).

Defense counsel argued the government failed to prove Buselli intended to kill her ex-husband.  The jury should doubt whether Buselli intended to kill Bradley because Colon deleted the messages which may have shown Buselli was just joking or made clear that she did not actually intend to harm Bardley. (ECF 173—p 685).  Agent Sanford wanted to get Paul involved to make sure Buselli was not just "venting." (ECF 173—p 686).  Buselli's testimony was reasonable in that she thought she was being scammed, and she agreed to make the payments to Paul because she feared him and just wanted him to go away. (ECF 173—p 688).  She really didn't believe he was a hit man because a hit man would not agree to a "payment plan." (ECF 173—p 689).  The government failed to prove, beyond a reasonable doubt, that Buselli intended to kill Bradley. (ECF 173—p 691).

## *Verdict*

The jury found Buselli guilty of murder-for-hire in Count I. (ECF 173—p 659).  On Count II, the jury found Buselli guilty of making both false statements. (ECF 173—p 725) (ECF 125).

## *Sentence*

The probation office prepared a Presentence Investigation Report which resulted in total offense level of 39, a criminal history score of zero, and a criminal history category of I. (PSR ¶¶ 60, 63, 67, 68).  This produced an advisory guideline range of 262 to 327 months. (PSR ¶ 113).  However, the statutory maximum sentences were 120 months on Count I and 60 months on Count II. (PSR ¶ 113).  In that circumstance, the guideline range becomes 180 months pursuant to USSG § 5G1.2(b). (PSR ¶ 113).

The district court imposed the maximum sentence available—120 months on Count I plus a consecutive sentence of 60 months on Count II for a total term of 180 months in prison. (ECF 151—p 2) (ECF 174—pp 100, 101).

(iv)    <u>Standards of Review</u>

**ISSUES I and III—** The legal correctness of a jury instruction is reviewed *de novo*, but the court reviews for abuse of discretion questions regarding the phrasing of an instruction or the refusal to give a requested instruction. *United States v. Mayweather*, 991 F.3d 1163, 1174 (11th Cir. 2021).

**ISSUE II —** The constitutionality of a statute, as applied, is reviewed *de novo*, *United States v. Fleury*, 20 F.4th 1353, 1362 (11th Cir. 2021), and may be reviewed for plain error. *United States v. Hughes*, 840 F.3d 1368, 1385 (11th Cir. 2016).

## SUMMARY OF THE ARGUMENT

**ISSUE I** — The district court erred in denying requested jury instructions on justifiable and excusable homicide, and justifiable use of deadly force. In Florida, these instructions are required in every homicide case (absent express waiver by the defendant) in order to distinguish between lawful and unlawful killings. The same instructions were therefore necessary in the present federal prosecution to prove the intent to commit murder "in violation of" Florida law, as required by 18 U.S.C. § 1958(a).

The instruction on justifiable use of deadly force was particularly appropriate here because it, alone, includes "defense of others" and encompasses the "imminent commission of a forcible felony against another" as well as the *threat* to use deadly force in defense of another, all of which were supported by the evidence.

**ISSUE II** — Title 18 U.S.C. § 1001(a), as applied here, is unconstitutional because it impinges on a defendant's Sixth Amendment rights to plead not guilty and demand a jury trial. Buselli's conviction for making false statements to the FBI sets a frightening precedent. During her interrogation, Buselli made two statements denying any intent to kill or harm Bradley Buselli. The application of the statute in this context—to statements denying guilt during the course of a criminal investigation and prosecution—amounts simply to punishment imposed for the

37

exercise of a defendant's Sixth Amendment rights to plead not guilty and to demand a trial by jury. Buselli received an additional five years in prison for denying guilt and demanding trial by jury. The error is plain.

**ISSUE III** — The offense of conviction, 18 U.S.C. § 1001(a), required the government to prove Buselli knowingly *and* willfully made a false statement to a federal agency. In federal criminal law, "willfully" means the defendant acted with the intent to violate the law. "Knowingly" means the defendant knew the facts which made her conduct criminal. The jury instructions, however, conflated the two terms and told the jury that "willfully" means knowing the statement was false. And the prosecutor, in closing, argued Buselli acted "willfully" because she knew the statements were false. The instructions therefore relieved the jury of the duty to find an essential element of the offense—that Buselli intended to violate the law when making the false statements. The error is plain.

# ARGUMENT

## ISSUE I

On Count I (murder-for-hire), the trial court erred, reversibly, by denying Buselli's requested jury instructions indispensable to the determination of criminal wrongdoing.

### *Legal Background*

Florida law proscribes a hierarchy of *unlawful* killings—premeditated murder, second degree murder and manslaughter by act—distinguishable by degree of mental culpability.   But the "murder statute" does not distinguish between lawful and unlawful killings. *See* Fla. Stat. § 782.04(1)(a) ("The unlawful killing of a human being: 1.  When perpetrated from the premeditated design to effect the death of the person killed … is murder in the first degree….").  That distinction is supplied by standard jury instructions on justifiable and excusable homicide. Fla. Std. Jury Instr. (Crim.) 7.1.  The manslaughter statute proscribes, *inter alia*, the killing of a human being by act, and distinguishes lawful versus unlawful killings in terms of the justifiable use of force provisions of chapter 776, and jury instruction on justifiable and excusable homicide. *See* Fla. Stat. § 782.07(1) ("The killing of a human being by [ ] act, … without lawful justification according to the provisions of chapter 776 and in cases which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, is manslaughter…."); *Howard*

39

*v. Moore*, 730 So. 2d 800, 801 (Fla. 4th DCA 1999) (when instructing on manslaughter, the court must define its exclusions "to enable the jury to understand the definition of manslaughter") (quoting *Hedges v. State*, 172 So. 2d 824, 826 (Fla. 1965)).

In a prosecution for first degree premeditated murder, the jury must be instructed on the necessarily lesser included (category one) offenses of second degree murder and manslaughter (absent express waiver by the defendant). Fla. Std. Jury Instr. (Crim.) 7.1 (schedule of lesser included offenses). The jury will be, therefore, instructed on justifiable and excusable homicide regardless of the degree charged homicide, i.e., first degree premeditated, second degree, or manslaughter. Fla. Std. Jury Instr. (Crim.) 7.1; *Hedges*, 172 So. 2d at 826 (manslaughter). In addition, the manslaughter charge requires instruction on justifiable use of deadly force, in conformity with chapter 776. Chapter 776 provides, in pertinent part:

> A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent imminent commission of a forcible felony.

Fla. Stat. § 776.012(2); *see also* Fla. Std. Jury Instr. (Crim.) 3.6(f).

The nature of category one necessarily included offenses is that the greater charged offense subsumes all the elements of the lesser category one offenses.

40

*Sanders v.* State, 944 So. 2d 203, 206 (Fla. 2006). Specifically, an *unlawful* first degree premeditated murder subsumes an *unlawful* second degree murder and an *unlawful* manslaughter by act. Because the *unlawfulness* of manslaughter by act must exclude the justifiable use of deadly force, the instruction is swept up and applicable to the greater offenses of first degree premeditated and second degree murder. *See Hill v. State*, 688 So. 2d 901, 906 (Fla. 1996) (instruction on justifiable use of deadly force "required in order to fully instruct on the crimes comprising homicide"). Manslaughter is defined by its exclusions. *Hedges v. State*, 172 So. 2d 824, 826 (Fla. 1965). The exclusions of manslaughter include justifiable use of deadly force (under chapter 776). Instruction on justifiable use of deadly force is therefore incorporated in all homicide prosecutions (absent express waiver).[1]

## *Application of the Law*

The government was required to prove Buselli intended a murder to be committed "in violation of" Florida law. 18 U.S.C. § 1958(a). The government could not do that without proving Buselli intended an *unlawful* killing. The jury could not make that determination without instruction on justifiable and excusable homicide, and justifiable use of deadly force. These jury instructions were required

---

[1] *See Armstrong v. State*, 579 So. 2d 734 (Fla. 1991) (in homicide prosecution, failure to instruct on justifiable and excusable homicide does not constitute fundamental error where instruction expressly waived by defendant).

to enable the jury to distinguish a lawful versus unlawful killing and thus find the intended killing to be "in violation of" Florida law, i.e., unlawful, as required by the plain text of 18 U.S.C. § 1958(a).

The district court erred in denying Buselli's requested jury instructions for three independent reasons. First, the requested instructions on justifiable and excusable homicide, and justifiable use of deadly force, were required to distinguish a lawful killing from an unlawful killing. The denial of the instructions constitutes reversible error under *Ruan*. Second, the denial of instruction on justifiable and excusable homicide, and justifiable use of deadly force, is reversible error per se, under Florida law, because Buselli specifically requested the instructions. And because a guilty verdict (for attempted premeditated murder) could not have been lawfully returned under Florida law, *regardless of the evidence presented*, the government's evidence failed to prove attempted murder "in violation of" Florida law, as required by § 1958(a). Third, the denial of instruction on justifiable use or threatened use of deadly force constituted reversible error because it was supported by the evidence presented at trial. The denial of the instruction robbed the jury of its fact-finding prerogative and the ability to acquit Buselli on the basis of a valid theory of defense.

1. The district court's denial of jury instructions on justifiable and excusable homicide, and justifiable use of deadly force, was reversible error under *Ruan*.

The murder-for-hire statute, 18 U.S.C. § 1958(a) required the government to prove, *inter alia*, that Buselli acted with the "intent that a murder be committed in violation of the laws of any State" (here, Florida). This statute, like most prescribing severe punishment, requires a *mens rea* element sufficient to "separate wrongful conduct from 'otherwise innocent conduct.'" *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022) (citing *Elonis v. United States*, 575 U.S. 723, 736 (2015); *Carter v. United States*, 530 U.S. 255, 269 (2000)). As in *Ruan*, the defendant's culpability should be judged by a subjective standard, focusing on the mental culpability of the particular defendant. *Id*. at 2378-82 (rejecting the objective or reasonable person standard). Thus, it is a defense to argue the conduct intended was not "wrongful" because it constituted justifiable or excusable homicide, or justifiable use of deadly force, under Florida law. As in *Ruan*, the defendant's culpability should be judged by a subjective standard.

Here, the jury could have acquitted Buselli on a number of grounds. The jury could have believed Buselli's claim that she did not intend to kill Bradley. She never thought Colon, or Paul, would actually kill Bradley. In the alternative, the jury could have found Buselli's intended conduct satisfied the Florida standards for justifiable

homicide, excusable homicide, or justifiable use of deadly force and, therefore, did not constitute blameworthy conduct as required by *Ruan*, nor a "violation of" the laws of Florida, as required by the murder-for-hire statute, § 1958(a).

The denial of the requested jury instructions prejudiced Buselli. As explained more fully below, the denial of jury instructions on justifiable and excusable homicide constituted fundamental error under Florida law irrespective of the evidence presented at trial. *See Spencer v. State*, 216 So. 3d 481, 485 (Fla. 2017); *State v. Lucas*, 645 So. 2d 425 (Fla. 1994). Given the erroneous omission of the instructions, the jury's finding of guilt, or wrongful conduct as required under *Ruan*, and Florida law, cannot be sustained. In other words, the return of a guilty verdict was legally erroneous. A new trial is required.

A new trial is also required based upon the denial of instruction on justifiable use of deadly force. It makes no difference whether justifiable use of deadly force is categorized as an "exclusion" to the definition of the charged offense or an affirmative defense. Either way, it is a law of Florida, and § 1958(a) requires the government to prove the defendant would have violated the laws (plural) of the State of Florida. The law provides, in pertinent part:

> A person is justified in using or threatening to use deadly force if he or she reasonable believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself

or another or to prevent the imminent commission of a forcible felony.

Fla. Stat. § 776.012(2); *see also* Fla. Std. Jury Instr. (Crim.) 3.6(f) (Justifiable Use or Threatened Use of Deadly Force).

At trial, the jury was presented with evidence of the ongoing commission of forcible felonies against Buselli's daughter, such as to justify either the use of deadly force or the threat to use deadly force. The jury heard evidence that Bradley was engaged in continuing physical and sexual abuse of Z.B. Buselli testified that her daughter told of Bradley putting his hand down her pants and "pushing on her," "hitting her on the vagina with his hand and with wrenches," and putting a hole in her butt and hurting her. (ECF 123-3—pp 17, 18, 20, 21, 22) (ECF 172—pp 558, 562-63). Although this evidence was disputed, that is not a basis for denying a jury instruction that is supported by "some evidence."

Alternatively, the jury was presented with evidence that Buselli intended only the "threatened" use of deadly force. Buselli testified that Colon initially offered to "beat up" Bradley. (ECF 172—p 555). She later agreed to let Colon "confront" Bradley—not murder him. (ECF 172—p 564). Buselli would have permitted Colon to "intervene," "confront" Bradley, and make "threatening remarks" to Bradley. (ECF 172—589). The jury reasonably could have construed the testimony as evidence of a threat to use deadly force.

45

Under Florida law, a defendant is entitled to instruction on any valid theory of defense if there is "some evidence" to support it, no matter how weak or improbable. *Goode v. State*, 856 1101, 1104 (Fla. 1st DCA 2003); *Arthur v. State*, 717 So. 2d 193 (Fla. 5th DCA 1998). And the question whether use or threatened use of deadly force is necessary to prevent imminent commission of a forcible felony is, if disputed, a question of fact for the jury. *Hernandez v. State*, 842 So. 2d 1049, 1051 (Fla. 4th DCA 2003). The district court deprived defense counsel of the opportunity to argue that use or threatened use of deadly force was necessary to prevent imminent commission of a forcible felony and deprived the jury of the prerogative to acquit Buselli on that basis. Buselli is entitled to a new trial.

The jury instruction on justifiable use of deadly force was likewise required, under *Ruan*, to prove Buselli's culpable state of mind, or blameworthiness, and to distinguish lawful and unlawful conduct "in violation of" Florida law, as required by § 1958(a).

> 2. The district court's denial of jury instruction on justifiable and excusable homicide was fundamental and reversible error under Florida law, so any jury finding of intent to commit murder "in violation of" Florida law was legally erroneous.

Under 18 U.S.C. § 1958(a), Buselli was charged with intent to commit an "*unlawful*, premeditated killing of a human being … [in] violation of the laws of the State of Florida." (ECF 173—p 659). The jury was thus properly charged with the

duty to distinguish an intended *lawful* killing from an intended *unlawful* killing. Under Florida law, this determination cannot be made unless the jury is instructed, in all cases, on justifiable and excusable homicide. It is well established that the failure to instruct on justifiable and excusable error is fundamental error and per se reversible error, even where there is no evidence to support a claim of justifiable or excusable homicide. *See Spencer v. State*, 216 So. 3d 481, 485 (Fla. 2017) (quoting *Philippe v. State*, 795 So. 2d 173, 174 (Fla. 3d DCA 2001) ("[F]ailure to give instructions and definitions on excusable and justifiable homicide in a murder or manslaughter case constitutes fundamental error because the trial court fails to advise the jury as to what constitutes lawful acts versus unlawful acts."); *Blandon v. State*, 657 So. 2d 1198, 1199 (Fla. 5th DCA 1995). Under the Florida doctrine of fundamental error, a contemporaneous objection is not required. The error may be raised for the first time on appeal.

The error is fatal "even where there is nothing in the evidence from which a jury could conclude that a homicide or an attempted homicide was excusable or justified." *Spencer*, 216 So. 3d at 486 (citing *State v. Lucas*, 645 So. 2d 425 (Fla. 1994)). "This is because justifiable and excusable homicide are always in dispute by virtue of the statutory definition of manslaughter," *id*. at 486, and Florida jury instructions specifying that the distinction between lawful and unlawful killings is

47

supplied by instruction on justifiable and excusable homicide. Fla. Std. Jury Instr. (Crim. 7.1); *see Smith v. State*, 773 So. 2d 1278, 1279 (Fla. 5th DCA 2000) ("In all murder and manslaughter cases, the jury must be instructed as to the definitions of justifiable and excusable homicide."). The error is reversible, per se. The doctrine of harmless error does not apply. *State v. Lucas*, 645 So. 2d at 427; *Rojas v. State*, 552 So. 2d 914, 916 (Fla. 1989); *Black v. State*, 695 So. 2d 459 (Fla. 1st DCA 1997).

Although no objection was required, the error is even more obvious in this case because Buselli requested instruction on justifiable and excusable homicide. The error is per se reversible. *Delaford v. State*, 449 So. 2d 983 (Fla. 2d DCA 1984).

The murder-for-hire statute requires the federal jury to find the defendant intended to commit a murder "in violation of" Florida law. Here, the jury was incapable of finding Buselli's intended conduct was "unlawful," and therefore "in violation of" Florida law, because of the omission of instruction on justifiable and excusable homicide. In Florida, the resulting guilty verdict would be deemed legally insufficient. Here, the jury's verdict was, likewise, legally insufficient because the jury did not differentiate between a lawful and unlawful killing. It cannot be said that the jury found Buselli, had she been successful in killing Bradley, would have committed a murder "in violation of" Florida law. Buselli is entitled to a new trial.

3. The district court erred, reversibly, in denying Buselli's request for jury instruction on justifiable use of deadly force.

The district court denied Buselli's request for instruction on justifiable use of deadly force. The relevant statute provides:

> A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent imminent commission of a forcible felony.

Fla. Stat. § 776.012(2); *see also* Fla. Std. Jury Instr. (Crim.) 3.6(f).

Buselli was prejudiced by the denial of the instruction for a number of reasons. First, justifiable use of deadly force encompasses "defense of others," an applicable theory of defense, because the jury was presented with evidence of the ongoing commission of forcible felonies against Buselli's daughter. Buselli testified that her daughter told of Bradley putting his hand down her pants and "pushing on her," "hitting her on the vagina with his hand and with wrenches," and putting a hole in her butt and hurting her. (ECF 123-3—pp 17, 18, 20, 21, 22) (ECF 172—pp 558, 562-63). The forcible felonies of aggravated assault and sexual battery are called into question. *See* Fla. Stat. § 776.08 (defining "forcible felony"). Although this evidence was disputed, that is not a basis for denying a jury instruction that is supported by "some evidence." *Goode*; *Arthur*.

49

Similarly, the instruction on justifiable use of deadly force applied because it encompassed the "threat" to use deadly force in defense. The jury was presented with evidence of a threat to use deadly force. Buselli agreed to let Colon "confront" Bradley—not murder him. (ECF 172—p 564). Buselli would have permitted Colon to "intervene," "confront" Bradley, and make "threatening remarks" to Bradley. (ECF 172—589). On this evidence, the jury reasonably could have found Buselli did not intend to kill Bradley but intended to threaten use of deadly force to deter his assaults upon her daughter.

Specifically, it is within the province of the jury to determine whether the commission of a forcible felony is "imminent." *Garrett v. State*, 148 So. 3d 466, 472-73 (Fla. 1st DCA 2014). "The trial court should not weigh the evidence for the purpose of determining whether the instruction is appropriate." *Gregory v. State*, 937 So. 2d 180, 182 (Fla. 4th DCA 2006). Here, if the jury believed forcible felonies were being committed repeatedly and the child was at risk every time she was surrendered to the custody of her father, they could have found the danger "imminent." "Imminent" does not mean "immediate," as found by the district court. (ECF 172—p 638) (ECF 177—pp 57-58). "Imminent means near at hand, mediate rather than immediate, close rather than touching." *Hunter v. State*, 687 So. 2d 277,

278 (Fla. 5th DCA 1997). If properly instructed, the jury could have concluded Buselli did not intend that a murder be committed "in violation of" Florida law.

The denial of jury instruction on justifiable use of deadly force in "defense of another" is reversible error when supported by some evidence. *Carranza v. State*, 511 So. 2d 410 (Fla. 4th DCA 1987). Indeed, there is even some authority that the denial of instruction on justifiable use of deadly force in defense of another, when supported by some evidence, constitutes fundamental error under Florida law. *David v. State*, 306 So. 3d 228, 232-36 (Fla. 3d DCA 2020); *Dawson v. State*, 597 So. 2d 924 (Fla. 1st DCA 1992).

Buselli notes the district court stated it would not instruct the jury on justifiable use of deadly force unless the theory was supported by the evidence. (ECF 111—p 4). In the end, the jury was presented with sufficient evidence to support the instruction, but the court failed to give it. The district court erred, reversibly.

### ISSUE II

> The offense of knowingly and willfully making a false statement to a federal agency is plainly unconstitutional as applied here; the false statements were nothing more than the denial of guilt during police interrogation; applying the statute in this context infringed on Buselli's Sixth Amendment right to plead not guilty and demand trial by jury.

Title 18 U.S.C. § 1001(a), as applied here, is unconstitutional because it impinges on a defendant's Sixth Amendment rights to plead not guilty and to demand a jury trial. Buselli's conviction for making materially false statements to the FBI sets a frightening precedent. During her interrogation, Buselli made two statements denying any intent to kill or harm Bradley Buselli. (ECF 123-6—pp 41, 44). The application of the statute in this context—to statements denying guilt during the course of a criminal investigation and prosecution—amounts simply to punishment imposed for Buselli's exercise of her Sixth Amendment rights to plead not guilty and to demand a trial by jury.

Agent Sanford said Buselli was not "in custody" during her interrogation, but he had already gathered substantial evidence against her, as well as warrants for her arrest and search of her home. (ECF 171—pp 282, 288, 303). Sanford invited her to the police station under the ruse of a missing persons investigation. (ECF 171—pp 282, 288). Buselli was his "target." (ECF 171—p 282). Sanford planned to question her first and then arrest her, so he read Buselli her *Miranda* rights at the outset. (ECF171—pp 282-83) (ECF 123-6—pp 5-6) (Gov. Exh. #24A).

The questioning was designed to induce incriminating statements. In Sanford's mind, Buselli could incriminate herself by confessing to murder-for-hire.

Or she could incriminate herself by making false statements to the FBI. Heads I win—tails you lose.

The murder-for-hire statute applies not only to materially false statements to federal agencies. It includes materially false statements regarding matters within the jurisdiction of the judiciary, as well. Applying this statute to defendants who proclaim innocence during the course of a criminal investigation or prosecution is truly frightening. The government's theory of prosecution is a direct affront to the Sixth Amendment rights of a defendant choosing to plead not guilty and exercising the right to trial by jury.

In *United States v. Endo*, 635 F.2d 321 (4th Cir. 1980), the court opined the admission or denial of guilt is more akin to an opinion or legal conclusion than an adjudicative fact. An adjudicative fact may be the subject of perjury, the denial of guilt may not. *Id*. at 323. And a conviction for perjury based on a conclusion of law (guilt or innocence) rather than a yet to be determined finding of guilt "is constitutionally impermissible as it discourages defendants from exercising their rights to testify, without substantially benefitting the administration of justice." *Id*.

> [S]tatements such as "I didn't bribe Mr. X" [ ] or "I didn't break into that house" are statements of ultimate facts which cannot be used as a basis for perjury.

*Id*. at 323, n. 3.

The additional punishment of five years in prison for denying guilt and demanding trial by jury constitutes plain error in violation of the unambiguous language of Fed. R. Crim. P. 10(a)(3) and 11(a)(1) and the Sixth Amendment, which guarantee those rights to Buselli. Although § 1001(b) provides a "judicial function exception" precluding prosecution for materially false statements made by a party to a judicial proceeding, that exception is not sufficient to protect Buselli's constitutional rights here because the specific statements were nothing more than a bare denial of guilt which Buselli was privileged to make at arraignment. The government should not be permitted to circumvent the protection afforded Buselli at arraignment by inducing her statements beforehand.

## ISSUE III

> On Count II (knowingly and willfully making a false statement to a federal agency), the trial court erred, plainly, by relieving the jury of the duty to find Buselli acted willfully, i.e., with the intent to violate the law.

The offense of conviction, 18 U.S.C. § 1001(a), required the government to prove Buselli knowingly *and* willfully made a materially false statement to a federal agency. These are two separate *mens rea* elements. "Knowingly" means the defendant knew the *facts* which made her conduct criminal, i.e., the statement was false. *Bryan v. United States*, 524 U.S. 184, 192-93 (1998). "Willfully" means the

defendant acted purposely, with the intent to violate the law. *Dixon v. United States*, 548 U.S. 1, 5 (2006); Eleventh Circuit Pattern Jury Instruction 9.1A.

The district court erred, plainly, by conflating these two elements. The court said the government must prove Buselli acted "willfully, knowing that the statement was false." In this manner, the instruction redefined "willfully," erroneously, to mean knowing the statement was false.

Buselli's argument follows the same grammatical construction the Court used in fashioning its standard instruction on "willfully."

> The word "willfully" means that an act was done voluntarily and purposefully, with the intent to do something the law forbids; …

Eleventh Circuit Pattern Jury Instruction 9.1A. By following the word "purposefully" with a comma, and the phrase "with the intent to do something the law forbids," the subsequent phrase modifies and defines the word "purposefully." Similarly, in the district court's statement of element #4, the phrase "knowing that the statement was false" defined the word "willfully." The court thus relieved the government of the burden to prove Buselli acted purposefully, with the intent to violate the law.

Buselli acknowledges that the district court had earlier, in its general instructions, defined "willfully" correctly to mean the defendant acted "purposefully

with the intent to do something the law forbids, that is, with a bad purpose to disobey or disregard the law." (ECF 173—p 658). But with regard to the specific elements of the crime, the court instructed the jury on element #4:

The defendant acted willfully, knowing that the statement was false;

(ECF 173—p 660). The jury reasonably could have interpreted this element in the same manner as the government. In closing, the prosecutor argued:

> There's no doubt that the lies that day were willful because she tells you, in the earlier evidence admitted in this case, that she's going to lie.

(ECF 173—p 679). In other words, Buselli knew her statements were false, therefore, she acted willfully. The jury instructions relieved the government of the burden to prove Buselli made her false statements "willfully," i.e, with the intent to violate the law.

There error is plain because it violated the unambiguous terms of § 1001(a), the precedent of the Supreme Court in *Dixon*, and the rule of this Court under Pattern Instruction 9.1A. The error affected Buselli's substantial rights because the jury reasonably could have acquitted Buselli on this Count. The jury could have found Buselli did not intend to violate the law and may not have known it was a crime to deny guilt upon questioning by the FBI. The jury could have reasonably concluded

that Buselli did not believe Agent Sanford's assertion that it was a crime to lie to him—because police officers frequently lie in the course of interrogations (as here).

The prosecutor argued the "willfulness" element was satisfied because Buselli knew her statements were false. The jury was thus relieved of the duty to find Buselli acted with the intent to violate the law. On the evidence presented, the jury could have found the government failed to prove Buselli made the false statement purposefully, with the intent to violate the law.

The error adversely affected Buselli's substantial rights because she reasonably could have been acquitted of the crime. An error which adversely affects the defendant's substantial rights ordinarily affects the fairness and integrity of the judicial proceeding. *See Rosales-Mireles, v. United States*, 138 S. Ct. 1897 (2018); *Molina-Martinez v. United States*, 578 U.S. 189 (2016).

## CONCLUSION

Based upon the argument and authority presented in ISSUE II, Buselli asks the Court to reverse her conviction on that Count. On the basis of the argument and authority presented in ISSUES I and III, Buselli asks the Court to reverse her convictions on both Counts and remand for a new trial.

Respectfully submitted,
**JOSEPH F. DEBELDER**
Federal Public Defender

*s/Richard M. Summa*
**RICHARD M. SUMMA**
Assistant Federal Public Defender
Florida Bar No. 890588
227 N. Bronough Street, Suite 4200
Tallahassee, Florida 32301
Telephone: (850) 942-8818
FAX: (850) 942-8809
Attorney for Appellant

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[**X**] this brief contains 12,964 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[**X**] this brief has been prepared in a proportionally spaced typeface using WordPerfect X6 in Times New Roman, 14 point, or

[ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

*s/Richard M. Summa*_____
**RICHARD M. SUMMA**
Assistant Federal Public Defender
Attorney for Appellant

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing has been furnished electronically in Acrobat format by Internet upload to this Court and to Assistant United States Attorney Robert G. Davies, 21 East Garden Street, Suite 40, Pensacola, FL 32502, and by U.S. Mail to Ms. Gretchen Buselli, Reg. No. 65303-509, FCI Phoenix, 37810 N. 45th Ave. Phoenix, AZ 85085 all on this 28th day of April, 2023.

*s/Richard M. Summa*
**RICHARD M. SUMMA**
Assistant Federal Public Defender